No. 3--97--0777

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

SHARON LEASING, INC., d/b/a ) Appeal from the Circuit Court

Refrigerated NationaLease, ) of DuPage County.

)

Plaintiff-Appellant and )

Cross-Appellee, )

)

) No. 95--L--01480

)

PHIL TERESE TRANSPORTATION, )

LTD., MICHAEL R. APA, ANTHONY )

APA, and FRANK DILEONARDI, )

) Honorable

Defendants-Appellees and ) Edward Duncan,

Cross-Appellants. ) Judge, Presiding.

_________________________________________________________________

JUSTICE THOMAS delivered the opinion of the court:

Plaintiff filed a complaint against defendants for 
tortious interference with contract, breach of contract against defendant Phil Terese Transportation, Ltd. (Phil Terese Transportation), breach of contract against the individual defendants under a piercing-the-corporate-veil theory, and common-law and statutory fraud.  Following a bench trial, the trial court first held that plaintiff did not have standing to bring its claim against defendants.  Stating that its ruling concerning standing might be erroneous, however, the trial court then ruled on the issues raised in plaintiff’s complaint.  The trial court held that plaintiff had not proved breach of a valid contract or damages, as required to recover on its claim for tortious interference with contract.  The trial court further held that Phil Terese Transportation’s corporate veil could be pierced as to defendants Michael Apa and Anthony Apa, but not as to defendant Frank DiLeonardi.  Nonetheless, with regard to the breach of contract claims against Phil Terese Transportation and the Apas, the trial court held that plaintiff had not proved its damages.  Finally, the trial court held that plaintiff had not proved a cause of action for fraud.  The trial court, therefore, entered a verdict in favor of defendants.

Plaintiff now timely appeals the trial court’s finding that plaintiff lacked standing to pursue its claims, that plaintiff had not proved damages on its breach of contract claims, that Phil Terese Transportation’s corporate veil should not be pierced as to Frank DiLeonardi, and that plaintiff had not proved that defendants tortiously interfered with plaintiff’s contract.  Defendants cross- appeal the trial court’s finding that Phil Terese Transportation’s corporate veil could be pierced as to Michael Apa and Anthony Apa.

The facts giving rise to plaintiff’s complaint are as follows.  Defendant Frank DiLeonardi was the sole shareholder of AMA Transport, a trucking company incorporated in 1989.  DiLeonardi formed AMA Transport from the assets of AMA Warehousing, which DiLeonardi had purchased at a public auction after AMA Warehousing had made an assignment for the benefit of creditors.  Codefendants Michael Apa and Anthony Apa had formed AMA Warehousing early in the 1980s.  DiLeonardi did not have an ownership interest in AMA Warehousing, and neither of the Apas had an ownership interest in AMA Transport, although they both worked for the company.  

On October 26, 1990, plaintiff entered into a five-year contract with AMA Transport for the lease of 25 trucks.  Isaac Freeman, one of plaintiff’s sales representatives, testified that although plaintiff’s invoices provided for payment within 21 days, AMA Transport had always paid the invoices in 30 to 45 days.  Freeman testified that around the beginning of 1994, AMA Transport began paying its invoices from six to nine weeks behind.   

At trial, DiLeonardi testified that in 1994, AMA Transport encountered financial difficulties.  It had been treating its truck drivers as independent contractors, but the Illinois Department of Employment Security held that the drivers were employees and assessed a $16,000 fine against the company.  DiLeonardi was afraid that the Internal Revenue Service would make a similar finding and also would assess a large fine against the company, so he decided to file for bankruptcy on behalf of AMA Transport.  On January 4, 1994, Michael Apa and Anthony Apa formed defendant Phil Terese Transportation, Ltd., which operated from the same address and used the same telephone number as AMA Transport.  Thereafter, on May 2, 1994, AMA Transport and Phil Terese Transportation entered into an asset purchase agreement pursuant to which AMA Transport sold its name, its carrying authority and all of its cartage contracts to Phil Terese Transportation for $26,000.  AMA Transport, however, never received the $26,000 from Phil Terese Transportation.  

Following the asset purchase agreement, AMA Transport continued to operate using plaintiff’s trucks.  Phil Terese Transportation also began to operate using some of plaintiff’s trucks.  Freeman testified that, in the first or second quarter of 1994, he thought that AMA Transport was taking over Phil Terese Transportation.  In the third quarter of 1994, he learned that Phil Terese Transportation was taking over AMA Transport because he was directed to pick up checks from Anthony Apa instead of Frank DiLeonardi. In addition, the checks said "Phil Terese Transportation," with the name "AMA Transport" in parentheses.  Freeman was told that AMA Transport was going to be switched over to Phil Terese Transportation, and that AMA Transport would eventually cease doing business.

Freeman also testified that on or around July 1, 1994, plaintiff sold some trucks to AMA Transport for $66,000.  AMA Transport put $6,000 down and executed a note for the remaining $60,000.  DiLeonardi signed the note for AMA Transport, then suggested that the note be put under Phil Terese Transportation’s name because AMA Transport would be gone before the end of the payment period.  Accordingly, the document was changed and put in Phil Terese Transportation’s name.  On or about April 22, 1995, plaintiff entered into a truck lease with Phil Terese Transportation.  On April 25, 1995, DiLeonardi signed AMA Transport’s petition for bankruptcy, which was filed on May 4, 1995.

Bruce Dandrew, plaintiff’s president, testified that he took over management of AMA Transport’s account when its accounts receivable were around $150,000.  Dandrew had a meeting in late 1994 with DiLeonardi and the Apas concerning the delinquent account.  Defendants told Dandrew that they had a tax problem and that they were going to transfer AMA Transport’s operations to Phil Terese Transportation and bankrupt AMA Transport.  Dandrew said that he did not repossess plaintiff’s vehicles at that time because he wanted to give defendants an opportunity to get some financing.  When AMA Transport’s accounts receivable still did not drop, Dandrew had a second meeting with defendants.  Defendants told Dandrew that the bank had turned down their request for financing, so Dandrew suggested putting the accounts receivable into a loan that defendants could pay off in six months to a year.  Defendants were agreeable to the concept of a loan but wanted around five years to pay off the loan.  After defendants refused to execute a short-term loan, Dandrew demanded repossession of plaintiff’s vehicles on May 6, 1995.  Following plaintiff’s repossession of its trucks, Phil Terese Transportation issued notice that it had assigned its assets for the benefit of creditors on May 12, 1995.   At trial, plaintiff offered into evidence as damages the open and unpaid invoices for AMA Transport and Phil Terese Transportation.  James Lynch, plaintiff’s comptroller, testified that the open invoices totaled $134,470.84, and the invoices which had been written off as bad debt totaled $105,076.56.  Plaintiff had repossessed the trucks that were the subject of the invoices, but plaintiff did not credit defendants’ invoices for any amounts received from the resale or lease of the trucks.  Further, Lynch testified that the balance due on the $60,000 note was $36,443.10, plus 20% per annum interest, although this amount did not reflect any credit for the resale or lease of the trucks that were the subject of the note.  Finally, Dandrew testified that plaintiff sent defendants an invoice in the compiled amount of $100,000 for liquidated damages as a result of defendants’ breach of the lease contract.

On the first day of trial, defendants moved for leave to file affirmative defenses of lack of standing and failure to mitigate damages.  Defendants claimed that plaintiff lacked standing as to its claims for tortious interference with contract, breach of contract against the individual defendants, common-law fraud, and statutory fraud because those claims could only be brought by the trustee of AMA Transport’s bankruptcy estate or by Phil Terese Transportation’s assignee for the benefit of creditors.  Defendants also claimed that plaintiff had failed to mitigate its damages as required by state law.  The trial court denied defendants’ motion but held that it was plaintiff’s burden to prove standing as part of its 
prima
 
facie
 case.  The court stated that defendants could then raise the standing issue at the close of plaintiff’s case.  The trial court also held that defendants could raise the issue of failure to mitigate damages at the conclusion of their case, but could not raise it as an affirmative defense because the defense was not timely filed.

At the close of plaintiff’s case, defendants moved for a directed finding on all counts of plaintiff’s complaint.  The trial court granted defendants’ motion with respect to its claim of statutory fraud but reserved ruling on the issue of standing and reserved ruling on the motion with respect to the other counts of the complaint.  At the end of trial, as noted, the trial court entered judgment in favor of defendants on all counts of plaintiff’s complaint. 

On appeal, plaintiff first argues that the trial court erred in rendering its verdict based upon plaintiff’s lack of standing after it had ruled that defendants were barred from raising standing as an affirmative defense.  Plaintiff claims that the trial court erroneously held that plaintiff was required to prove standing in its case in chief because lack of standing is an affirmative defense that is waived if not raised in a timely fashion.  Plaintiff further argues that, even if the standing defense had been timely raised, plaintiff did have standing to bring its claims because none of plaintiff’s claims could have been considered property of AMA Transport’s bankruptcy estate or of Phil Terese Transportation’s assignee.

In response, defendants argue that, in denying their motion for leave to add an affirmative defense concerning lack of standing, the trial court made no finding of prejudice to plaintiff and preserved the issue for later review.  Defendants also argue that the trial court’s findings should be affirmed because plaintiff’s claims are property of the estates of AMA Transport and Phil Terese Transportation and, therefore, may be raised only by the bankruptcy trustee and the assignee.  Because plaintiff failed to show that the bankruptcy trustee and the assignee had abandoned those claims, plaintiff lacked standing to raise those claims.

We agree with plaintiff that the trial court erred in ruling that plaintiff was required to prove standing as part of its 
prima
 
facie
 case.  As noted by plaintiff, lack of standing is an affirmative defense that is waived if not raised in a timely fashion.  
Greer v. Illinois Housing Development Authority
, 122 Ill. 2d 462, 508 (1988).  A plaintiff initially has no burden to plead and prove standing.  
Senese v. Climatemp, Inc.
, 222 Ill. App. 3d 302, 317 (1991).  It is the defendant who must plead and prove lack of standing as a defense to a plaintiff’s claim.  
Senese
, 222 Ill. App. 3d at 317.  Because we also find that the trial court’s finding that plaintiff lacked standing in this case was erroneous, however, we need not decide whether the trial court’s ruling constituted reversible error.

In ruling that plaintiff had no standing to bring its claim, the trial court relied on an opinion of the United States Court of Appeals for the Seventh Circuit, 
Koch Refining v. Farmers Union Central Exchange, Inc.
, 831 F.2d 1339 (7th
 Cir. 1987).  There, the seventh circuit held that a bankruptcy trustee has no standing to bring a personal claim of creditors but may bring an action that is a general claim of creditors.  
Koch Refining
, 831 F.2d at 1348-49.  A general claim is one wherein the liability is to all creditors of a corporation.  
Koch Refining
, 831 F.2d at 1349.  The trial court in this case also noted the seventh circuit decision in 
Steinberg v. Buczynski
, 40 F.3d 890 (7th
 Cir. 1994), where the Seventh Circuit seemed to abandon the distinction between personal and general claims.  The trial court stated, however, that it did not believe the courts in Illinois had abandoned the general and personal distinction in bankruptcy cases.  The trial court therefore concluded that the plaintiff’s cause of action was a general cause of action and thus the property of the bankruptcy trustee or the assignee for the benefit of creditors.

As noted by the trial court, the seventh circuit in 
Koch Refining
 held that a bankruptcy trustee represents not only the rights of the debtor but also the interests of the creditors of the debtor.  
Koch Refining
, 831 F.2d at 1342.  At issue in 
Koch Refining
 was whether the plaintiffs, rather than the bankruptcy trustee, were the proper parties to bring an alter ego action against the fiduciaries of the debtor.  
Koch Refining
, 831 F.2d 1339.  The 
Koch Refining
 court concluded that, under Illinois law, a bankruptcy trustee can bring an alter ego claim.  
Koch Refining
, 831 F.2d at 1346.  The court held that a trustee has a right to bring any action in which the debtor has an interest, including actions for breach of duty or misconduct against the debtor’s officers and directors.  
Koch Refining
, 831 F.2d at 1348.  A trustee lacks standing only as to those claims in which one creditor has been harmed and no other creditor or claimant has an interest in the claim.  
Koch Refining
, 831 F.2d at 1348.

Following the decision in 
Koch Refining
, this court in 
Aspling v. Ferrall
, 232 Ill. App. 3d 758 (1992), addressed whether a bankruptcy trustee had the exclusive 
right to assert an alter ego claim.  This court interpreted 
Koch Refining
 "to mean that the bankruptcy trustee, as the proper party to bring general claims of the bankruptcy estate, has the exclusive right to bring an alter ego action against corporate shareholders and fiduciaries."  
Aspling
, 232 Ill. App. 3d at 763.  The plaintiff in 
Aspling
 sought damages from the defendant under an alter ego theory, contending that the defendant had treated his corporation as though it was a proprietorship and, for the purpose of defrauding the plaintiff, had paid himself $24,000 from the corporation when the corporation was insolvent.  
Aspling
, 232 Ill. App. 3d at 760.  This court found that the plaintiff had alleged a general claim against the defendant, which was exclusively within the province of the bankruptcy trustee.  
Aspling
, 232 Ill. App. 3d at 764.  This court also noted that principles of finality dictated a finding that the plaintiff lacked standing, as the bankruptcy estate had been distributed and a preference action against the defendant had been settled.  
Aspling
, 232 Ill. App. 3d at 766.

Following the 
Aspling
 decision, the Illinois Supreme Court addressed the issue of whether a corporation may bring an alter ego action against its parent shareholder, thereby piercing its own corporate veil.  
In re Rehabilitation of Centaur Insurance Co.
, 158 Ill. 2d 166 (1994).  The supreme court stated that this court’s decision in 
Aspling
 did not determine whether a corporation in Illinois has standing to assert an alter ego action against its own shareholders but rather held that a creditor of a bankrupt corporation could not assert an alter ego action against a corporation’s shareholder because a similar claim had already been brought and settled by the bankruptcy trustee, and the plaintiff creditor had already received a settlement from the bankruptcy estate.  
Centaur Insurance Co.
, 158 Ill. 2d at 174-75.  The supreme court stated that, although the 
Aspling
 court had noted 
Koch Refining
’s holding that a corporation in Illinois could assert an alter ego claim against its parent corporation, the 
Aspling
 court did not discuss whether that was the law in Illinois.  
Centaur Insurance Co.
, 158 Ill. 2d at 174.

The Illinois Supreme Court then noted that the 
Koch Refining
 case relied on an interpretation of Illinois alter ego law that was not the law in Illinois.  
Centaur Insurance Co.
, 158 Ill. 2d at 176.  The supreme court declined to adopt the 
Koch Refining
 court’s reasoning.  
Centaur Insurance Co.
, 158 Ill. 2d at 175.  The court instead concluded that a corporation may not assert an alter ego action against its own shareholders.  
Centaur Insurance Co.
, 158 Ill. 2d at 172.  The court held that an alter ego action is needed by creditors because creditors do not have standing to bring actions for breaches of fiduciary duties.  
Centaur Insurance Co.
, 158 Ill. 2d at 178.

Because the issue of standing presents a question of law, we review the trial court’s finding 
de
 
novo
.   
Anderson v. McHenry Township
, 289 Ill. App. 3d 830, 832 (1997).  State law governs the causes of action that can be asserted by creditors and by bankruptcy trustees.  
Koch Refining
, 831 F.2d at 1348.  We therefore look to Illinois case law to determine whether plaintiff had standing to assert its causes of action.  As noted, our supreme court has rejected the 
Koch Refining
 court’s interpretation of Illinois alter ego law.  Accordingly, the trial court erred in finding that, based on the decision in 
Koch Refining
, plaintiff lacked standing to bring its claims against defendants.  Pursuant to the decision in 
In re Rehabilitation of Centaur Insurance Co.
, which was not discussed by the trial court, we find that plaintiff, as creditor of AMA Transport and Phil Terese Transportation, had standing to bring the alter ego claims against defendants.  A reviewing court, however, is not bound by a trial court’s reasoning and may affirm upon any ground in the trial record.  
International Precision Components Corp. v. Lake County Zoning Board of Appeals
, 282 Ill. App. 3d 735, 738 (1996).  Consequently, because we find that plaintiff did have standing to assert its claims against defendants, we must determine whether the trial court’s verdict in favor of defendants may be affirmed based upon the trial court’s rulings on the substantive issues in plaintiff’s complaint.

With regard to the substantive issues, plaintiff first argues that the trial court erred in finding that plaintiff had failed to prove its damages as required to recover on its breach of contract claims.  Plaintiff contends that it proved its damages clearly and with specificity and that defendant was not entitled to a setoff against the money it owed.  The breach of contract damages plaintiff claimed included $239,547.40 in unpaid invoices (including the invoices that had been written off), $36,443.10 in principal due under the $60,000 promissory note, plus 20% per annum in interest, and $100,000 in liquidated damages.

In rendering its verdict, the trial court noted that plaintiff’s comptroller, James Lynch, could not state why certain debts were written off, nor did he indicate that any credits were made for the resale or reletting of the trucks.  The trial court stated that plaintiff’s contract required a credit for funds received when there was a reletting or subsequent sale of repossessed trucks.  Because plaintiff had failed to credit defendant for the funds received, the trial court found that it was unable to discern plaintiff’s damages with reasonable certainty. 

The rule that a trial court’s findings in a bench trial will not be disturbed unless manifestly erroneous applies equally to a trial court’s assessment of damages.  
Haudrich v. Howmedica, Inc.
, 169 Ill. 2d 525, 543 (1996).  The burden rests on the party seeking to recover to establish that he sustained damages and to establish a reasonable basis for the computation of those damages.  
Keno & Sons Construction Co. v. LaSalle National Bank
, 214 Ill. App. 3d 310, 312 (1991).  The general rule in contract actions is that damages should place the injured party in the position he would have been in had the contract been performed.  
Illiana Machine and Manufacturing Corp. v. Duro-Chrome Corp.
, 152 Ill. App. 3d 764, 768 (1987).  A damage award should not result in a windfall to the plaintiff.  
Illiana Machine and Manufacturing Corp.
, 152 Ill. App. 3d at 768.

In finding that plaintiff had not proved damages on its breach of contract claims, the trial court relied on article 15 of plaintiff’s lease.  That article, entitled "Default By Customer and Remedies," provided that in the event of a default plaintiff may take possession of the subject vehicles and may also require the customer to either purchase the vehicles or make an alternative payment as set forth in article 16 of plaintiff’s lease.  Article 15 of plaintiff’s lease also provided:

"In the event that CUSTOMER shall fail to purchase the Vehicle (or, at RNL’s [plaintiff’s] option, make the alternative payment), ***, RNL may sell the Vehicle(s) at one (1) or more public or private sales, with or without notice to CUSTOMER, ***.  The proceeds of the sale, less RNL’s expenses ***, shall be applied to payment of any obligations due to RNL by CUSTOMER under this lease or otherwise.  CUSTOMER shall remain liable for the balance due RNL under the preceding paragraph and for any deficiency in the balance of any sums due RNL under any other lease or indebtedness."

Further, in the event plaintiff retained the vehicles because it could not or chose not to resell them, article 15 of the lease required plaintiff to credit the customer with the then net fair market value of the vehicles and to apply that net fair market value to the customer’s obligations under the lease.

As noted, rather than require defendants to purchase the subject vehicles, plaintiff sought the alternative payment set forth in article 16 of the lease.  Article 16, entitled "Termination Privileges," provided as follows:

"Upon termination by either party, CUSTOMER shall, at RNL’s option, purchase the Vehicle as to which the notice has been given ***.  Alternatively, in lieu of purchasing the Vehicle, CUSTOMER may elect to pay RNL the difference, if any, between the purchase price as calculated in this Article and the Fair Market Value *** ."

Plaintiff argues that because it sought the alternative payment set forth in article 16, defendants were not entitled to any credit against their obligations under article 15.  Plaintiff claims that the provisions in paragraph 15 relating to credits from the proceeds of a sale or for the net fair market value of the repossessed vehicles applied only when plaintiff required a customer to purchase the subject vehicles, not when plaintiff elected the alternative payment under article 16.  In response, defendants argue that article 15 required plaintiff to credit defendants with the net sale proceeds or net fair market value of the trucks at issue in the lease even when the article 16 alternative payment was sought.

Both sides agree that articles 15 and 16 are at best poorly drafted.  Those provisions were drafted by plaintiff.  A contract is to be construed strictly against the drafter.  
Lake Bluff Heating and Air Conditioning Supply, Inc. v. Harris Trust and Savings Bank
, 117 Ill. App. 3d 284, 294 (1983).  Upon reviewing the lease at issue and construing it strictly against plaintiff, we agree with defendants.  The provision in article 15 of plaintiff’s lease concerning credits toward a customer’s obligations stated that it applied "[i]n the event that CUSTOMER shall fail to purchase the Vehicle (
or, at RNL’s option, make the alternative payment
)." (Emphasis added.)  By the very language of the lease, this provision applied when a customer failed to make the alternative payment.  The evidence in this case was uncontroverted that defendants had failed to make the alternative payment pursuant to article 16.  Accordingly, article 15 then authorized plaintiff to sell the subject vehicles, and required plaintiff to credit defendants with the proceeds of any sale, less plaintiff’s expenses, or to credit defendants with the net fair market value of the vehicles if plaintiff retained the vehicles.  Plaintiff’s comptroller and president both admitted that some of the subject vehicles had been resold or leased and further admitted that plaintiff had not credited defendants’ invoices or note with the proceeds from any of those sales or leases.  No evidence was introduced  concerning which trucks had been resold or leased, nor was any evidence introduced concerning the net amount received upon resale or lease.  Furthermore, there was no evidence concerning how many vehicles had been retained by plaintiff or the net fair market value of those vehicles.

Absent any evidence concerning the number of trucks resold or leased, the proceeds from the resale or lease of those trucks, or the net fair market value of the retained vehicles, the trial court could not ascertain the damages that would place plaintiff in the position it would have been in had the contract been performed.  Plaintiff’s claim that it was owed $239,547.40 in unpaid invoices and $36,443.10 on its note was at best speculative and, given plaintiff’s admission that it had not applied any credits toward defendants’ lease obligations, likely would have resulted in a windfall to plaintiff.  Accordingly, the trial court correctly found that plaintiff had failed both to establish its damages on the unpaid invoices and note and to establish a reasonable basis for the computation of those damages.

We further find that plaintiff failed to establish that it was entitled to $100,000 in damages pursuant to the alternative damage formula set forth in article 16 of its lease.  Article 16 of the lease explained the alternative payment as follows:

"[T]he difference, if any, between the purchase price as calculated in this Article and the Fair Market Value (defined as the highest appraisal of market value (wholesale) received by RNL from two (2) or more independent vehicle dealers of each such vehicle as of the date of termination (the 'alternative payment').  The purchase price of the Vehicle shall be the original agreed value of the Vehicle set forth in Schedule 'A' less the weekly depreciation credit of the Vehicle set forth in Schedule 'A' multiplied by the number of weeks elapsed from the in service date of the Vehicle to the termination date, provided, however, that the purchase price to be paid by the CUSTOMER for the Vehicle shall not be less than fifteen percent (15%) of its original agreed value set forth in Schedule 'A'."

In support of its claim for damages under this article, plaintiff produced an invoice to defendants that simply had two entries for premature cancellation of lease at $50,000 each.  Dandrew testified that he performed the calculations to arrive at the $100,000 figure but did not testify concerning the numbers he used, nor did plaintiff offer into evidence any written calculations.  Dandrew claimed that plaintiff lost $30,000 to $35,000 on the repossession, repair, and resale of the trucks subject to the note but offered no evidence to support his claim.  Dandrew stated that plaintiff repossessed the trucks "and tried to add up the damages, the breach of the lease contract in which the lessee is to pay the difference between the wholesale value and the Schedule A’s value.  And we sent [defendants] an invoice for all of that in a compiled amount of $100,000."  Dandrew later claimed that the vehicles were in such disrepair that plaintiff "never really got an iron clad wholesale value on the vehicles in their existing state."

Based upon Dandrew’s testimony, the trial court could have concluded that plaintiff did not attempt to determine its damages under article 16 and instead simply estimated its damage figure.  In fact, as noted by defendants, plaintiff did not establish the fair market value for the trucks, the original agreed value of the trucks, or the weekly depreciation credit of the trucks, as required pursuant to article 16 of plaintiff’s lease.  Because plaintiff did not comply with the formula set forth in article 16 to determine its damages, we find that plaintiff’s $100,000 damage claim also is speculative.  We therefore agree with the trial court that plaintiff failed to establish that it sustained $100,000 in damages and that plaintiff failed to establish a reasonable basis for the computation of those damages.  Consequently, we affirm the trial court’s verdict in favor of defendants on the ground that plaintiff did not prove the damage element of its breach of contract and tortious-interference-with-contract claims.

Plaintiff then argues that, even if defendants were entitled to a setoff under their lease, defendants waived that right when they failed to file a timely affirmative defense on the issue of mitigation and when defendants failed to present any evidence concerning the amount of setoff to which they were entitled.  Plaintiff also claims that the trial court erred in ruling that defendants were entitled to a setoff after it had denied defendants’ leave to add an affirmative defense concerning mitigation of damages.

Plaintiff correctly notes that the failure to mitigate damages is an affirmative defense that must be pleaded and proved by a defendant in a breach of contract case.  
Illiana Machine and Manufacturing Corp. v. Dura-Chrome Corp.
, 152 Ill. App. 3d 764, 769 (1987).  Plaintiff, however, incorrectly characterizes the evidence concerning credits from the proceeds of any sales to be applied toward defendants’ obligations as mitigation of damages evidence.  Rather, the testimony concerning plaintiff’s failure to apply credits from the proceeds of any sales toward defendants’ lease obligations was relevant to determine whether plaintiff had established its breach of contract damages.  Accordingly, the trial court properly admitted that evidence.  

In contrast, it is arguable that the evidence concerning the leasing of the repossessed vehicles was improperly admitted because that evidence went to the issue of mitigation.  Plaintiff’s lease did not require plaintiff to attempt to lease the repossessed vehicles or to credit defendants with the proceeds of any subsequent leases.  Even if such evidence was improperly admitted, however, we cannot say that the admission of that evidence prejudiced plaintiff or affected the outcome of the trial.  In a case tried before the court without a jury, any error in admitting evidence is not grounds for reversal as long as there is sufficient evidence to support the judgment.  
Phillips v. Britton
, 162 Ill. App. 3d 774, 786 (1987).  Here, as noted, there was sufficient competent evidence to support the trial court’s judgment.    

Because we affirm the trial court’s verdict in favor of defendants on the ground that plaintiff had failed to establish damages on its breach of contract claims, we need not address the plaintiff’s claim that the trial court erred in finding that there was no breach of contract on its tortious-interference-with-

contract claim and in finding that Frank DiLeonardi was not personally liable for the debts of AMA Transport, nor do we need to address defendants’ claim that the trial court erred in holding Michael Apa and Anthony Apa personally liable for Phil Terese Transportation’s debts.

For the foregoing reasons, the judgment of the Circuit Court of DuPage County is affirmed.

Affirmed.

BOWMAN and HUTCHINSON, JJ., concur.